**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF MICHIGAN**

DENISE WILLIAMS

            Plaintiff,

v.

MORGAN STANLEY & CO., INC.,
DAVID DARST, MICHAEL CHU, JOSEPH
MICHALAK, MATTHEW TURNBULL,
JOSEPH GIRARDIN, TAAL ASHMAN,
SAM FLAM, KATHLEEN FITZGERALD,
AND RONALD BULTMAN

            Defendants.

Jury Trial Demanded

## COMPLAINT

Plaintiff Denise Williams, by and through her attorneys Stowell & Friedman, Ltd.,
respectfully submits her Complaint against Defendant Morgan Stanley & Co., Inc. ("Defendant,"
"Morgan Stanley" or "the Firm") and the individual defendants listed above, and states as
follows:

### OVERVIEW

1.     Morgan Stanley is a leader in the retail brokerage industry, having "one of the
largest retail brokerage networks and domestic retail locations in the United States."[1]  Through
its registered brokerage team of Financial Advisors, Morgan Stanley provides a wide variety of
financial products and services to its retail brokerage clients.

2.     Plaintiff has been employed as a Financial Advisor ("FA") by Morgan Stanley
since 2004 in the Firm's Livonia, Michigan office.  Despite her strong performance and

---

[1] www.morganstanley.com/about/careers/index.html

dedicated service, Plaintiff has been subjected to unlawful treatment, including race discrimination and retaliation, throughout her employment at Morgan Stanley.

3.      As explained below, Morgan Stanley has denied Plaintiff the same business opportunities and resources provided to her colleagues who are not African-American, co-opted Plaintiff's business plans and prospects, subjected Plaintiff to an unbearably hostile work environment, and retaliated against Plaintiff when she challenged her treatment and the Firm's discriminatory practices regarding African-American clients, including its racial redlining practices.

4.      Plaintiff's treatment is pursuant to Morgan Stanley's nationwide, systemic discrimination against African-American employees and clients in its retail brokerage business, or Global Wealth Management Group.  Morgan Stanley has and is engaged in a pattern and practice of race discrimination and retaliation and employs company-wide practices that have a disparate impact on African-Americans.  Morgan Stanley fails to provide African-Americans with equal opportunities to earn income and advance to management.  The Firm maintains harmful stereotypes and biased views about its African-American employees and clients that form the basis of personnel and business decisions and create a hostile work environment where occupational segregation and differential treatment are pervasive and condoned.  Morgan Stanley's management and human resources functions are ineffective at resolving complaints of race discrimination and retaliation and, as a result, many African-Americans recognize the futility of lodging internal complaints.  Those who do come forward, like Plaintiff, suffer retaliation.  Morgan Stanley's systemic discrimination is ongoing, as demonstrated by the dramatic, historic and continuing underrepresentation of African-Americans as FAs and in management, and their disproportionately high rates of attrition.

5.      Because she desired to effect change at Morgan Stanley, Plaintiff was a named plaintiff in the class action lawsuit *Jaffe v. Morgan Stanley,* Case No. 06 C 3903 (N.D. Cal.).  As part of her role as a putative class representative, Plaintiff reported the Firm's race discrimination towards African-American employees like herself as well as against African-American clients and potential clients.  Plaintiff's well-founded and substantiated concerns were not addressed or taken seriously by class counsel or Morgan Stanley, who negotiated a settlement of the *Jaffe* lawsuit without her input, participation, or consent.  Plaintiff, the sole class representative, was excluded from participating in class settlement negotiations.  As a result, the proposed *Jaffe* settlement was, and is, grossly deficient, both in terms of its inadequate equitable remedies and insufficient financial relief offered to class members to release their valuable legal claims.

6.      Plaintiff's many concerns with the blatant shortcomings of the *Jaffe* settlement were flatly rejected, as were her objections to expanding the class to release the claims of Latino FAs and FA Trainees without a Latino class representative or named plaintiff.  Plaintiff refused to support or participate in the *Jaffe* class settlement because it would not improve the working conditions of African-Americans at Morgan Stanley but would simply perpetuate and institutionalize the Firm's rampant race discrimination.  Worse, the proposed settlement would potentially insulate the Firm from liability for the catastrophic harm its actions had caused to African-American employees and clients.  After Plaintiff's principled refusal to support the *Jaffe* settlement, Morgan Stanley's discrimination and retaliation against her escalated to the point where Plaintiff's work environment became unbearable.  Fearing for her health, safety, and future, Plaintiff has been unable to work at Morgan Stanley in the Livonia, Michigan office since late 2007.  After Plaintiff opted out of the *Jaffe* settlement, which then purported to strip her of

standing to challenge its terms, Plaintiff suffered additional retaliation as Morgan Stanley

intensified its efforts to terminate her employment.

## JURISDICTION AND VENUE

7.      Jurisdiction is based on 28 U.S.C. §§1331 and 1343, Title VII of the Civil Rights

Act of 1964 (as amended) ("Title VII"); Section 1977 of the Revised Statutes, 42 U.S.C. Section

1981, as amended ("Section 1981"); and principles of pendant and supplemental jurisdiction

pursuant to 28 U.S.C. §1367.

8.      Venue is proper in the Eastern District of Michigan pursuant to 28 U.S.C.  §

1391(b).  Plaintiff resides in and worked for Defendant Morgan Stanley in this District, where

she was subjected to unlawful treatment by Morgan Stanley pursuant to the Firm's nationwide

discriminatory practices.  Further, Morgan Stanley is licensed and conducts business in this

District, and the Individual Defendants harmed Plaintiff, work and reside in this District.

## PARTIES

9.      Plaintiff, an African-American woman, has been employed as a Financial Advisor

("FA") at Morgan Stanley's branch office in Livonia, Michigan since 2004.  Plaintiff has

exhausted her administrative remedies under Title VII by filing a representative Charge of

Discrimination with the Equal Employment Opportunity Commission and receiving a notice of

right to sue.

10.      Defendant Morgan Stanley[2] is a Delaware corporation headquartered in New

York.  Morgan Stanley provides a wide variety of financial products and services to its global

and domestic clients.  As of year-end 2007, Morgan Stanley managed approximately $749

---

[2] On April 1, 2007, Morgan Stanley merged with Morgan Stanley Dean Witter Inc., an affiliated broker-dealer registered with the SEC, into Morgan Stanley and Co., Inc.

billion of client assets[3] and employed more than 8,000 people as FAs in over 500 offices in the United States.[4]  Morgan Stanley is registered with the Securities and Exchange Commission ("SEC") as a broker-dealer, and with the Commodity Futures Trading Commission ("CFTC") as a futures commission merchant.

11.     Morgan Stanley, Inc., the parent corporation of Morgan Stanley, is a publicly traded, global financial services firm and Fortune 500 Delaware corporation, also headquartered in New York.  In 2007, Morgan Stanley, Inc. achieved net revenues of over $28 billion and a net income of nearly $3.2 billion, and maintained shareholders equity of over $31 billion.[5]

12.     Defendant David Darst ("Darst") is the Chief Investment Strategist and Managing Director of Morgan Stanley's Global Wealth Management Group.   Darst is responsible, among other things, for the development, implementation and enforcement of Morgan Stanley's policies and practices in its Global Wealth Management Group, including in the office where Plaintiff is employed.  In his capacity as a Morgan Stanley executive, and pursuant to Defendant's pattern and practice of race discrimination, Darst engaged in unlawful conduct against Plaintiff and caused her substantial harm.

13.     Defendant Joseph Michalak, ("Michalak") a Caucasian man, was the branch manager of the Livonia, Michigan office of Morgan Stanley from approximately 2005 to 2006. On information and belief, Michalak resides in this District.  In his capacity as management and as a producing FA for Morgan Stanley, and pursuant to Defendant's pattern and practice of race discrimination, Michalak engaged in unlawful conduct against Plaintiff and caused her substantial harm.

---

[3] See www.morganstanley.com and the Firm's 2007 Form 10K.
[4] www.morganstanley.com/about/careers/recruiting/company_am.html
[5] See www.morganstanley.com and the Firm's 2007 Form 10K.

14.     Defendant Michael Chu ("Chu") was the branch manager of the Livonia, Michigan branch office of Morgan Stanley from approximately 2004 to 2005.  On information and belief, Chu, resides in this District.  In his capacity as management and as a producing FA for Morgan Stanley, and pursuant to Defendant's pattern and practice of race discrimination, Chu engaged in unlawful conduct against Plaintiff and caused her substantial harm.

15.     Defendant Matthew Turnbull ("Turnbull") was the branch manager of the Livonia, Michigan branch office of Morgan Stanley from approximately June 2006 to June 2007.  On information and belief, Turnbull resides in this District.  In his capacity as Morgan Stanley management, and pursuant to Defendant's pattern and practice of race discrimination, Turnbull engaged in unlawful conduct against Plaintiff and caused her substantial harm..

16.     Defendant Taal Ashman, ("Ashman") a Caucasian man, is or was an FA in the Livonia, Michigan branch office of Morgan Stanley.  Ashman engaged in unlawful conduct against Plaintiff and caused her substantial harm.

17.     Defendant Sam Flam, ("Flam") a Caucasian man, is or was an FA in the Livonia, Michigan branch office of Morgan Stanley.  Flam engaged in unlawful conduct against Plaintiff and caused her substantial harm.

18.     Defendant Joseph Girardin, ("Girardin") a Caucasian man, is or was an FA in the Livonia, Michigan branch office of Morgan Stanley.  Girardin engaged in unlawful conduct against Plaintiff and caused her substantial harm.

19.     Defendant Kathleen Fitzgerald, ("Fitzgerald") a Caucasian woman, is an FA a Morgan Stanley branch office in Livonia, Michigan.  Fitzgerald engaged in unlawful conduct against Plaintiff and caused her substantial harm.

20.     Defendant Ronald Bultman, ("Bultman") a Caucasian man, is an FA a Morgan Stanley branch office in Livonia, Michigan.  Bultman engaged in unlawful conduct against Plaintiff and caused her substantial harm.

### BROKERAGE BUSINESS AND FIRM-WIDE DISCRIMINATORY PRACTICES

21.     Morgan Stanley Financial Advisors are registered brokers who provide investment advice and perform brokerage, wealth management, and other financial services and transactions for the Firm's individual and institutional clients.  The FAs who work at Defendant's branch offices across the country develop, advise and service the Firm's clients.

22.     FAs are supervised by branch managers who implement the Firm's company-wide policies and distribute resources and income-generating opportunities to FAs in the offices they manage.[6]  Managerial support is important for FAs to operate a smooth, efficient and profitable business.  In addition to providing resources and opportunities, managers can also provide assistance in maneuvering within the Firm and its policies, be an important resource for ideas and business support, help develop and sustain client relationships, and make recommendations regarding promotional opportunities.

23.     As a result of Defendant's systemic discrimination, African-Americans are nearly excluded from branch management.  On information and belief, of the approximately 500 branch managers at Morgan Stanley, fewer than five branch managers are African-American.  Pursuant to company-wide policies, Morgan Stanley vests its nearly all-white management team with a substantial amount of discretion, and the Firm's managers exercise that discretion in a manner that disadvantages African-Americans.  The Firm's managers steer business and partnership

---

[6] In addition to allocating limited resources, such as accounts, office space, and sales assistants, managers approve certain activities and financial expenditures.

opportunities to white FAs and do not provide African-American FAs with the same level of resources and support as their white counterparts.

24.     An FA attains clients in a number of ways, including through the FA's own efforts and contacts, as well as through transfers from other FAs; membership in a partnership, or team, of brokers; and the receipt of accounts, leads, referrals, walk-ins, call-ins, and other opportunities provided by the Firm.  The Firm ranks and compensates its FAs, and distributes valuable resources, on a comparative and competitive scale based on a combination of revenue generated from client accounts and an FA's length of service.

25.     Due to the competitive manner in which FAs are compensated, a level playing field and fair distribution of resources and opportunities is essential.  Morgan Stanley, however, does not provide African-Americans with equal opportunities to earn income and advance to management.  Consistent with the Firm's racially hostile corporate culture, Morgan Stanley maintains discriminatory company-wide policies and practices regarding the assignment of business and partnership opportunities, sales and managerial support, and resources.

26.     Morgan Stanley has a strong, uniform corporate culture that is biased against African-Americans and creates and reinforces a hostile work environment and the differential treatment of African-Americans.  Embedded in the Firm's culture are pervasive, negative stereotypes views about the skills, abilities, work ethic, and potential of African-Americans, both as employees and clients.  Morgan Stanley's racially biased culture and harmful racial stereotypes infect its policies and work environment and form the basis of personnel decisions that disadvantage African-Americans.

27.     Morgan Stanley maintains race-based attitudes about its African-American clients and FAs, as is evident by its efforts to steer African-American FAs to African-American clients,

and vice versa.  Morgan Stanley also employs racial "redlining" practices whereby African-American clients are not prospected or provided access to Morgan Stanley's products and services.

28.     Defendant's pattern and practice of race discrimination is also demonstrated by its historic and continued underrepresentation of African-American brokers and managers. Defendant has been on notice of its disparity in treatment and opportunities for African-Americans for over thirty years.  In the 1970s, the Equal Employment Opportunity Commission ("EEOC") sued Defendant's predecessor, Dean Witter, for engaging in a pattern and practice of race and sex discrimination with respect to recruitment, hiring, assignment, training, promotion, and other terms and conditions of employment.  *See EEOC v. Dean Witter & Co, Inc.*, Case No. 78-839 (E.D. Pa.).

29.     Little has changed in the three decades since the EEOC sued Dean Witter.  Due to the Firm's discriminatory hiring, employment and promotion practices, African-Americans remain underrepresented as FAs and in management as compared to their availability in the relevant labor markets.  The few African-Americans Defendant hires earn less compensation and suffer an attrition rate substantially higher than the attrition rate of non-African-Americans due to the Firm's racially biased culture and systemic refusal to provide African-Americans with equal opportunities to succeed.

### INDIVIDUAL FACTUAL ALLEGATIONS

30.     Throughout Plaintiff's employment at Morgan Stanley, she has performed her responsibilities diligently and competently, and has enjoyed an excellent reputation with regard to her work.  Nevertheless, consistent with Morgan Stanley's pattern and practice of race

discrimination and retaliation, Plaintiff has been subjected to unlawful treatment throughout her tenure at the Firm.

31.     Plaintiff's colleagues have enjoyed managerial and sales support, received business and partnership opportunities, and been able to work in a collegial and supportive work environment.  Plaintiff, however, has not received the same treatment or opportunities to succeed.  To the contrary, Plaintiff has been ostracized and subjected to overt racial hostility in a work environment in which African-American employees and clients are treated as inferior and with contempt.  Despite her hard work and impressive performance, Plaintiff has been denied resources, mentoring, managerial and sales support, and income-generating opportunities.  She has also been excluded from favorable partnerships.  As a result, Plaintiff has received lower wages and commissions than similarly situated non-African-Americans.

**Morgan Stanley Co-Opted, Rather Than Supported, Plaintiff's Business Opportunities**

32.     Plaintiff's experiences at Morgan Stanley have been markedly different than the experiences of her colleagues who are not African-American.  When Plaintiff began her employment with Morgan Stanley in March 2004, she was the only African-American in her hiring class of approximately five persons.  Plaintiff remained the only African-American tenured FA in her branch office, which employed up to or over 40 FAs.  Plaintiff has not reported to an African-American manager at Morgan Stanley.

33.     Because Plaintiff did not receive the support or business opportunities offered to her colleagues, Plaintiff was forced to develop her clients and book of business based solely on her own ideas and hard work.  On a number of occasions, Plaintiff's business plans and prospective clients were taken from her and assigned to Caucasian FAs in the office.

34.     The Firm's unlawful treatment of Plaintiff began early in her tenure.  During the interview process, Plaintiff presented a multi-leveled business plan that she had developed involving the education arena, which she understood was a generally untapped market for Morgan Stanley.  Plaintiff's business plan identified business opportunities in all 515 or so of the school districts within the State of Michigan, containing over 500,000 estimated potential accounts.  Plaintiff's conservative projections demonstrated that the Firm could generate well over $200 million in revenue using her business plan, which she designed so that it could be implemented in all 50 states.  Plaintiff's business plan was also applicable to industries and fields outside of the educational arena.  Morgan Stanley offered Plaintiff a position during the interview based on the strength and excitement generated by her plan.

35.     Plaintiff understands that Darst, a senior Morgan Stanley executive, met with Turnbull and his superior to review and discuss Plaintiff's business and marketing plan.

36.     After Plaintiff began her employment at Morgan Stanley, her manager, Chu directed her to work with Bultman on her education business plan.

37.     Plaintiff created a strong marketing plan and developed contacts by holding presentations and meetings with key figures and groups within Michigan school districts.  Once these inroads were made, Plaintiff began to compile a direct mailing campaign, listing both herself and Bultman as contacts for interested potential clients.

38.     After Plaintiff's hard work establishing the foundation for her business plan, however, Morgan Stanley then excluded her from her own project.  Bultman removed Plaintiff's name from client mailings and contacted clients without including or informing Plaintiff.  Despite Plaintiff's protests, Bultman took the client lists, contacts, and marketing information and began running the project on his own.

39.     Chu, Plaintiff's manager, refused to support her, and her complaints to Chu and to Bultman were ignored.  Plaintiff was denied credit for the creation of the project and was not permitted to work on or with the clients that resulted from her business plan.  Plaintiff lost substantial opportunities for client accounts and production, as well as the resulting compensation and recognition.

40.     Morgan Stanley redirected other opportunities developed by Plaintiff to Caucasian FAs during her tenure.  For example, recognizing a solid business opportunity, Plaintiff had worked diligently to make inroads with the United Auto Workers ("UAW"), and position herself in the union's network.  When General Motors announced that it would be downsizing in approximately May 2006, the opportunity to provide financial services to retiring UAW workers became apparent.  Plaintiff was well positioned to garner a substantial amount of business from this opportunity.  Shortly after GM's announcement, however, Michalak, Plaintiff's branch manager at the time, removed Plaintiff from the UAW account opportunity and instead positioned two Caucasian FAs, Flam and Girardin, to work with the UAW.

41.     After taking the UAW account from Plaintiff and giving these lucrative opportunities to Girardin and Flam, Michalak then partnered with Flam on some of the UAW accounts.  Michalak made presentations with Flam to the important contacts with whom Plaintiff had established relationships.  Michalak did not offer to team with Plaintiff on any UAW accounts.

42.     Michalak said that he had taken the UAW opportunity from Plaintiff because she "couldn't handle it," or words to that effect.  This statement was false and the product of racial bias and stereotypes, as Plaintiff had made progress and established good relationships at UAW.

Michalak, however, refused to support Plaintiff's efforts and hard work, or to even discuss the UAW account with Plaintiff, ignoring her calls and requests to meet.

43.     On another occasion, Plaintiff received the opportunity to be a contractor for the Detroit Public Schools, which would have given her access to work with over 3,000 potential clients.  Michalak refused to support Plaintiff and instead positioned and supported Flam as the contact for Detroit Public Schools.

44.     Management's refusal to support Plaintiff's prospecting efforts and its reassignment of opportunities she developed to other FAs appeared designed to prevent her success and to drive her from the Firm.  Indeed, during a conversation with Michalak, Ashman said about Plaintiff, "[s]he will be out of business within a year," or words to that effect. Michalak agreed.

### Plaintiff Has Been Denied Business and Partnership Opportunities

45.     As described above, the success of FAs is contingent on a number of factors, including access to partnership opportunities and to business opportunities like accounts of retiring or departing brokers, leads, referrals, and opportunities for clients to participate in initial public offerings ("IPO").  Morgan Stanley employs discriminatory policies and practices regarding the assignment of these business and partnership opportunities.

46.     Consistent with the Firm's discriminatory practices, Plaintiff has been denied business and partnership opportunities that would have allowed her to generate substantial income.  Many of Plaintiff's colleagues have received lucrative business opportunities, including the accounts of departing FAs, in order to help build and grow their books of business.  For example, Plaintiff learned that management assisted Girardin by assigning him accounts in order to improve his production.  Plaintiff, however, received few, if any, accounts following FA

departures. Indeed, many FAs with substantial assets departed during Plaintiff's tenure, and their assets were largely distributed to Plaintiff's non African-American colleagues and other Caucasian FAs in the Birmingham, Michigan office.

47.    When Plaintiff asked her manager, Michalak, why she was not receiving the same quantity or quality of accounts as her less-experienced, Caucasian colleagues, he retorted that account distributions were "his decisions" and "a privilege, not a right," or words to that effect. Michalak also supplied many of the FAs in the office with cold-call leads and other income-generating opportunities, but did not provide the same opportunities to Plaintiff.

48.    The discriminatory distribution of opportunities continued under Plaintiff's next manager, Turnbull.  Even after Plaintiff informed Turnbull of her concerns about account distributions and partnerships, Turnbull assigned substantial accounts to less-experienced, Caucasian FAs, including Girardin.  On information and belief, Turnbull later arranged for Girardin, who was failing, to receive additional assistance by placing him in a partnership with Dominic Nieto, who was, at the time, one of the office's highest producing FAs.  Turnbull failed to give Plaintiff the same consideration or opportunities.

49.    Plaintiff was similarly disadvantaged by the Firm's discriminatory policies and practices regarding partnerships, or teams, of FAs.  Partnerships are often formed at the direction of management and must be approved by management.  Partnerships act to steer assets and business opportunities to non African-Americans, including those who would not otherwise receive these assets and opportunities.  Partnerships often protect the beneficiaries of past and ongoing discrimination and prevent their accounts from being distributed in an equitable fashion.

50.    African-Americans are largely excluded from favorable partnerships.  As a result of stereotypes and discrimination, the skills and contributions of African-American FAs are not

valued, and they are not selected or permitted to join partnerships as equal partners.  Worse,

management condones and participates in the segregation of partnerships.  On the rare occasions

when African-Americans are invited to join a partnership, it often becomes a vehicle to

cannibalize their opportunities and/or books of business.

51.     Plaintiff was denied the opportunity to form or join favorable partnerships.  Her

managers refused to help her develop partnership opportunities, but assisted Caucasian FAs in

forming favorable partnerships, or teams.  When Plaintiff asked Michalak for an opportunity to

join a partnership, he said that no one wanted to partner with her and conceded that this was due

to her race, explaining "people like people who are like them."

### Plaintiff Has Been Denied Adequate Management and Sales Support

52.     Plaintiff did not receive the same mentoring or managerial or sales support as her

colleagues on account of her race.  Plaintiff's managers provided her with no guidance regarding

her business but instead largely ignored her.  As described above, to the extent her managers

became involved in her business activities, it was to take them from her.

53.     Nor did management support Plaintiff's business development and networking

initiatives.  For example, Plaintiff was invited to attend the national conference of the National

Association of Securities Professionals ("NASP"), an organization for African-American

financial professionals.  Michalak refused to support her attendance or participation at this

conference and said, "[i]f it's not bringing in money, I'm not supporting it," or words to that

effect.  Michalak's views were based on his and Morgan Stanley's stereotypical attitudes that

African-Americans, even African-American financial professionals, were not desirable or

valuable clients.  Moreover, Michalak and other Morgan Stanley management frequently

supported the attendance of other non African-American FAs at similar conferences and seminars.

54.     Plaintiff was also denied adequate sales support on account of her race.  While Plaintiff's Caucasian colleagues, were assigned skilled, and sometimes even licensed, sales assistants ("SAs"), Plaintiff had inadequate SA support.  As a result, Plaintiff had to perform many of the administrative tasks of an SA, taking time from her efforts to develop and service her clients.  Plaintiff's first SA was widely acknowledged to be the most incompetent SA in the office.  Plaintiff's business suffered as a result of the SA's poor work ethic and incompetence.  Plaintiff's complaints about the SA's performance were ignored, and Plaintiff was only assigned a new assistant when a new manager moved the SA to the receptionist position.

55.     Plaintiff's next SA, Diana Jones ("Jones"), refused to support Plaintiff's business, often refusing to process client requests, providing Plaintiff and her clients with incorrect information, losing important paperwork, and failing to ensure that checks were processed on time.  Due to racial animus, Jones was openly hostile to Plaintiff and her clients.[7]  On the rare occasions when Jones would address Plaintiff, she was bitter and very short with her.  Jones' treatment of other Caucasian FAs in the office was much different, as she was professional and performed their work without issue.

56.     Plaintiff complained to management about Jones' behavior and performance, to no avail.  Michalak refused to reassign Plaintiff another SA or to reprimand Jones.  When Plaintiff continued to protest, Jones was told she no longer had to work for Plaintiff, and Plaintiff was told not to talk to Jones.  Plaintiff was not assigned another dedicated SA, however, leaving her with no sales support for her business.

---

[7] Jones admitted her hostility towards Plaintiff and, at one point, even asked for forgiveness.  Her behavior, however, largely remained unchanged.

57.     Plaintiff remains without an SA, and her ability to perform her primary responsibilities as an FA has been hampered.  None of Plaintiff's colleagues work without the assistance of an SA.

### Plaintiff Has Been Subjected To A Hostile Work Environment

58.     Throughout her tenure at Morgan Stanley, Plaintiff has been subjected to a hostile work environment.  Plaintiff's managers and co-workers have been openly hostile to her and regularly made negative comments about African-Americans, including African-American community leaders and clients of Morgan Stanley.

59.     In particular, Taal Ashman's behavior exemplifies the culture and environment that pervaded Plaintiff's office.  Ashman, a senior FA in the Livonia office at the time, regularly made derogatory remarks about African-Americans, including African-American clients, and referred to them as "niggers,""stupid," and "worthless."  As described below, Ashman trained junior FAs to screen clients and calls to avoid working with African-American clients.

60.     Ashman was disdainful of Plaintiff and refused to look at her on the rare occasions when he spoke to her.  He even interfered with her ability to serve her clients.  To illustrate, on one occasion when Plaintiff was printing documents for a client who had arrived for a meeting, Ashman deliberately unplugged the printer and pulled the paper tray out of the machine so that Plaintiff could not print.  Unnerved, Plaintiff told him that she was printing documents for a client, but Ashman left Plaintiff to fix the machine.

61.     Racially charged and offensive conduct and comments occurred regularly and openly in Plaintiff's office, with no fear of repercussion.  When Plaintiff made known her disapproval, the conduct did not stop, and Plaintiff was targeted for further abuse by the Defendants and other Morgan Stanley employees.

62.     After one such occasion, Plaintiff met with Michalak, in response to her colleagues' conduct and threatened to lodge a formal complaint at a higher level.  Rather than investigate Plaintiff's well-founded complaints or take any action against the wrongdoers, Michalak simply sent an office-wide e-mail that included the Firm's non-discrimination policy. Plaintiff's colleagues were again openly defiant.  After receiving the e-mail, Ashman exclaimed to Girardin, and in front of Plaintiff: "What is Joe [Michalak] trying to do, take away our fun? Harassment is the fun part!"

63.     In addition to the differential treatment and retaliation described herein, Plaintiff has always been treated as an unwelcome outsider at Morgan Stanley.  Plaintiff has been excluded and ostracized in her office.  Plaintiff's managers have made no genuine attempt to mentor or otherwise assist her, or to regularly include her in meetings, social outings or networking opportunities.

64.     Plaintiff's co-workers, too, rarely spoke to her, and did not share information or resources with Plaintiff that they regularly shared with each other, such as research and other relevant and helpful industry information.  At office meetings, Plaintiff was frequently forced to sit alone, and her contributions were largely ignored.

65.     Ashman made a public show of excluding Plaintiff during office meetings.  When food was delivered, Ashman would pass out plates and place settings for all of the meeting attendees other than Plaintiff.  When Plaintiff arrived at work meetings, Ashman turned his back to her, and did not acknowledge or assist her as he did with her non-African-American colleagues.

66.     Plaintiff's other colleagues were similarly open about their hostility towards Plaintiff.  For example, during a performance of the Alvin Ailey Dance Troupe, an

internationally acclaimed African-American dance troupe of which Morgan Stanley is a national supporter,  Plaintiff was conversing with her African-American clients and another Caucasian FA.  Suddenly, Fitzgerald approached and, in a voice loud enough for all to hear, asked the Caucasian FA something to the effect of "wouldn't you prefer sitting with *us*?" referring to the table of all-Caucasian individuals with whom she was sitting.  The FA then left the table and joined Fitzgerald and her Caucasian counterparts at their table.

67.     In addition to being excluded at the office, Plaintiff was excluded from Firm outings and gatherings, both impromptu and company-sponsored.  Management participated directly in Plaintiff's exclusion from firm activities.  For example, Morgan Stanley sponsored various events for the staff, at which tickets were generally required.  Although Plaintiff's non African-American counterparts were always supplied with tickets, Plaintiff was often told that there were not enough tickets available for her to attend.

68.     On one occasion, Plaintiff asked Michalak for tickets to a performance of the Alvin Ailey Dance Troupe for herself and some clients.  Michalak told Plaintiff that there were no tickets available for her or her clients.  However, Plaintiff later learned that there were many tickets available, and ultimately received tickets from another source.  On another occasion, Plaintiff requested tickets to a firm-sponsored event, and again Michalak told her there were no remaining tickets.  Later that same afternoon, however, Michalak announced that he had 6 more tickets to the event that would go to the first people who requested them.

### Morgan Stanley Is Engaged In Racial Steering And Racial "Redlining" of Its Clients And Potential Clients

69.     Morgan Stanley's racial animus toward Plaintiff also extended to its African-American clients and potential clients.  As briefly described above, African-American clients

were openly referred to in Plaintiff's branch office as "stupid niggers" and as "idiots," among other things.

70.     Morgan Stanley regularly trained junior FAs to identify zip codes that had a substantial African-American population and instructed them not to prospect or serve these zip codes. Based on racial stereotypes and hostility, Morgan Stanley viewed African-American clients as "worthless" and not desirable.

71.     As a result of this racial redlining of zip codes and other similar practices, African-Americans were denied access to Morgan Stanley's products and services. Similarly, FAs such as Plaintiff were denied the opportunity to service those African-American clients.

72.     Plaintiff complained about these discriminatory practices to management, Human Resources, and Morgan Stanley's outside counsel. To Plaintiff's knowledge, no action was taken against those who participated in and condoned this unlawful discrimination. Indeed, on one such occasion, when Plaintiff complained to Michalak about her treatment and the office environment, he told her to "take it as a learning experience," or words to that effect. After Plaintiff raised these important issues to Morgan Stanley, she suffered further retaliation.

**Plaintiff Has Suffered Retaliation For Challenging Morgan Stanley's Unlawful Treatment Of Her And Of The Firm's African-American Clients.**

73.     Despite the obvious risks to her employment, Plaintiff repeatedly challenged her own unlawful treatment, as well as the unlawful treatment of African-American clients. Plaintiff brought these important issues to the attention of management, Human Resources, and Morgan Stanley's outside counsel. Plaintiff is not aware that Morgan Stanley ever conducted a meaningful investigation or held anyone accountable for any of the conduct or events she raised. To the contrary, the differential treatment of Plaintiff continued unabated, and even escalated, after she complained.

74.     Morgan Stanley's retaliation against Plaintiff included, but was not limited to, further denial of opportunities and resources, further exclusion from office activities, being stripped of her sales assistance, and removal from office to a desk in the bullpen, where many of the "rookie" or first-year brokers sit.  African-Americans remained the target of racial slurs, and Plaintiff was targeted for additional harassment.

75.     The discrimination and retaliation against Plaintiff did not subside with a change in management.  When Turnbull assumed responsibility for the Livonia office, Plaintiff informed him of the unlawful conduct in the Livonia office, including the overt racial hostility, her lack of sales assistance, and unfair assignment of accounts and partnership opportunities.  Plaintiff's working conditions, however, did not change, nor did the Firm's unlawful treatment of Plaintiff and other African-Americans.

76.     Plaintiff had been afraid to report her treatment and the office conduct to Human Resources, hoping instead that her management team would address the rampant unlawful treatment.  Plaintiff feared that any report to Human Resources regarding the racial discrimination would only intensify her managers' and coworkers' animosity toward her and risk her job.  However, in or around 2007, Plaintiff informed Human Resources and the Firm's in-house and outside counsel about the discrimination and retaliation she had suffered, as well as the racial discrimination against African-American clients.  Plaintiff is not aware that the Firm took any action.

77.     Even after raising the rampant unlawful treatment with Morgan Stanley corporate, Morgan Stanley's treatment of Plaintiff did not improve.  Instead, it worsened.  For example, Plaintiff has even been harassed by FAs from other offices.  Paul Toby, an FA at the Farmington,

Michigan office and a friend of Ashman's, "visited" the Livonia office and told Plaintiff to "get out" of the office.

**Plaintiff Has Suffered Extreme Emotional Distress**

78.　By the acts and conduct described above, Morgan Stanley intended to and did cause Plaintiff severe emotional distress.  The acts and conduct of Morgan Stanley toward Plaintiff constitutes extreme and outrageous conduct beyond the bounds of common decency.

**Plaintiff Has Been Injured as a Consequence of Defendant's Unlawful Conduct**

79.　Plaintiff has lost wages and other benefits, has suffered embarrassment and humiliation, and her career has been irreparably injured as a result of Morgan Stanley's unlawful conduct.  Plaintiff has suffered loss of enjoyment of life, inconvenience and other non-pecuniary losses as a direct result of Morgan Stanley's conduct.

80.　Morgan Stanley's conduct has caused and continues to cause Plaintiff substantial losses in earnings, management opportunities and other employment benefits, in an amount to be determined by a jury.

## COUNT I

### RACE DISCRIMINATION IN VIOLATION OF TITLE VII

**(Against Morgan Stanley)**

81.　Plaintiff realleges and incorporates by reference as though stated in Count I each preceding paragraph of this Complaint.

82.　Plaintiff filed charges of racial discrimination with the Equal Employment Opportunity Commission ("EEOC") against Morgan Stanley, and received a Right to Sue Notice.

83.    Title VII of the Civil Rights of 1964, 42 U.S.C. 2000e *et seq.* and amendments thereto ("Title VII") make it unlawful for an employer to fail or refuse to hire or to discharge any individual, or to otherwise discriminate against any individual with respect to her compensation, terms or conditions, or privileges of employment, because of such individual's race, color or national origin; or to limit, segregate, or classify employees or applicants for employment in any way which would deprive or tend to deprive any individual of employment opportunities or otherwise adversely affect her status as an employee, because of such individual's race, color, or national origin.

84.    It is unlawful for an employer to engage in racially biased decision-making and treatment or to make decisions infected by stereotypes.  Employers are not lawfully allowed to engage in racially motivated conduct driven by business concerns, for example, concerns about the effect on employee relations, or the negative reaction of clients or customers.  Thus, an employer violates the law when it acquiesces, accedes to or perpetuates perceived customer bias. Nor may race or color ever be a bona fide occupational qualification.

85.    Through the conduct alleged in this Complaint, Morgan Stanley violated Title VII of the Civil Rights Act of 1964 and amendments thereto by subjecting Plaintiff and other African-Americans to differential treatment, by adopting policies and practices that had a disparate impact against African-Americans, and by engaging in conduct that limited, classified and segregated African-Americans in a manner that deprived them of opportunities.

86.    Morgan Stanley is responsible for the acts and conduct of its managers and knew of should have known of a culture created by its managers and employees that was hostile to and resulted in differential treatment of Plaintiff and other African-Americans.

87.     Morgan Stanley has allowed the unlawful conduct alleged herein to exist and to go unremedied for so long that it amounts to a policy or practice and constitutes Morgan Stanley's standard operating procedure.

88.     Plaintiff suffered losses and was otherwise harmed as a direct and proximate result of Morgan Stanley's unlawful actions and inaction.

## COUNT II

### RACE DISCRIMINATION IN VIOLATION OF 42 U.S.C. SECTION 1981

### (Against All Defendants)

89.     Plaintiff realleges and incorporates by reference as though stated in Count II each preceding paragraph of this Complaint.

90.     Section 1977 of the Revised Statutes, 42 U.S.C. Section 1981, as amended, guarantees persons of all races the same right to make and enforce contracts, regardless of race. The terms "make and enforce contracts" includes the making, performance, modification, and termination of contracts, and the enjoyment of all benefits, privileges, terms, and conditions of contractual relationships, including employment contracts and relationships.

91.     The Defendants engaged in intentional race discrimination against Plaintiff and other African-Americans in violation of 42 U.S.C. Section 1981.

92.     Plaintiff suffered losses and was otherwise harmed as a direct and proximate result of Defendants' unlawful actions and inaction.

## COUNT III

### RACE DISCRIMINATION IN VIOLATION OF 42 U.S.C. SECTION 1981

### (RACIAL STEERING, RACIAL REDLINING, AND DIFFERENTIAL TREATMENT OF AFRICAN-AMERICAN CLIENTS AND POTENTIAL CLIENTS)

### (Against All Defendants)

93.     Plaintiff realleges and incorporates by reference as though stated in Count III each preceding paragraph of this Complaint.

94.     Section 1977 of the Revised Statutes, 42 U.S.C. Section 1981, as amended, guarantees persons of all races the same right to make and enforce contracts, regardless of race. The terms "make and enforce contracts" includes the making, performance, modification, and termination of contracts, and the enjoyment of all benefits, privileges, terms, and conditions of contractual relationship.

95.     In violation of 42 U.S.C. Section 1981, Morgan Stanley engaged in a pattern and practice of racial steering, racial redlining and differential treatment of African-American clients and potential clients.  Morgan Stanley sought to and did deny African-Americans access to its products and services based on racial animus and stereotypes.  Morgan Stanley also sought to steer African-American Financial Advisors to serve African-American clients, and vice versa. Morgan Stanley engaged in race discrimination against Plaintiff and other African-Americans by limiting its customer base to non African-Americans by devaluing or discouraging the retention of  African-American clients.

96.     Plaintiff and other African-Americans suffered losses and were otherwise harmed as a direct and proximate result of Morgan Stanley's unlawful conduct.

## COUNT IV

## RETALIATION IN VIOLATION OF TITLE VII

### (Against Morgan Stanley)

97.     Plaintiff realleges and incorporates by reference as though stated in Count IV each preceding paragraph of this Complaint.

98.     Title VII, 42 U.S.C. 2000e-3, makes its unlawful for an employer to discriminate against an employee who has opposed an unlawful employment practice or has assisted or participated in another employee's claim of discrimination.

99.     Plaintiff engaged in protected activity by opposing and complaining of conduct that violated Title VII, and for her participation in the *Jaffe v. Morgan Stanley* lawsuit and rejection of its proposed settlement.

100.     Morgan Stanley took adverse action and unlawfully retaliated against Plaintiff for opposing Morgan Stanley's unlawful conduct and the *Jaffe* settlement, in violation of the anti-retaliation provisions of Title VII.

101.     The unlawful employment practices alleged herein were intentional and were performed by Morgan Stanley with malice or reckless indifference to Plaintiff's rights and Morgan Stanley's obligations under Title VII.

102.     Plaintiff suffered losses and was otherwise harmed as a result of Morgan Stanley's unlawful conduct.

## COUNT V

## RETALIATION IN VIOLATION OF SECTION 1981

### (Against All Defendants)

103.     Plaintiff realleges and incorporates by reference as though stated in Count V each preceding paragraph of this Complaint.

104.     It is unlawful under Section 1977 of the Revised Statutes, 42 U.S.C. Section 1981, as amended, to discriminate against an employee who has opposed an unlawful employment practice or has assisted or participated in another employee's claim of discrimination.

105.     Plaintiff engaged in protected activity by opposing and complaining of conduct that violated Section 1981, and for her actions in the *Jaffe v. Morgan Stanley* lawsuit.

106.     Morgan Stanley took adverse action and unlawfully retaliated against Plaintiff for opposing Morgan Stanley's unlawful conduct and the *Jaffe* settlement, in violation of Section 1981.

## COUNT VI

### RACE DISCRIMINATION
### IN VIOLATION OF ELLIOTT-LARSEN CIVIL RIGHTS ACT

**(Against All Defendants)**

107.     Plaintiff realleges and incorporates by reference as though stated in Count VI each preceding paragraph of this Complaint.

108.     At all material times, Plaintiff was an employee, and Morgan Stanley was her employer, covered by and within the meaning of the Michigan Elliott-Larsen Civil Rights Act, MCL 37.2101 *et seq*.

109.     Morgan Stanley and the individual Defendants treated Plaintiff differently from and worse than similarly situated non African-American employees in her terms and conditions of employment, based on her race, and employed practices that had a disparate impact on African-Americans.

110.     The conduct of the Defendants violates MCL 37.2101 *et seq*.

111.     Plaintiff suffered losses and was otherwise harmed as a direct and proximate result of Morgan Stanley's unlawful conduct.

## COUNT VII

### RETALIATION IN VIOLATION OF ELLIOTT-LARSEN CIVIL RIGHTS ACT

**(Against All Defendants)**

112.    Plaintiff realleges and incorporates by reference as though stated in Count VII each preceding paragraph of this Complaint.

113.    The Defendants have taken adverse action and retaliated against Plaintiff for opposing violations of the Elliott-Larsen Civil Rights Act, in violation of the said Act.

114.    Plaintiff suffered losses and was otherwise harmed as a direct and proximate result of Defendants' unlawful conduct.

## COUNT VIII

### BREACH OF EXPRESS CONTRACT

### (Against Morgan Stanley)

115.    Plaintiff realleges and incorporates by reference as though stated in Count VIII each preceding paragraph of this Complaint.

116.    Morgan Stanley entered into certain written contracts with the Plaintiff.  These contracts required Morgan Stanley to provide Plaintiff with leads, referrals, account distributions, training, sales support, managerial support, mentoring, and other resources.  They also required Morgan Stanley to comply with the civil rights laws and the Firm's equal employment and antidiscrimination policies.

117.    Morgan Stanley breached these contracts by engaging in the conduct described herein and otherwise failing to perform its obligations under its policies and the laws set forth in this Complaint.

118.    These breaches by Morgan Stanley caused Plaintiff substantial harm.

## COUNT IX

### PROMISSORY ESTOPPEL AND DETRIMENTAL RELIANCE

### (Against Morgan Stanley, Darst, Chu, Michalak, and Turnbull)

119.    Plaintiff realleges and incorporates by reference as though stated in Count IX each preceding paragraph of this Complaint.

120.    Morgan Stanley entered into certain implied contracts with Plaintiff.  These contracts arose out of written instruments, oral promises, employee handbooks, and patterns and practices of customary conduct, and included, *inter alia*, antidiscrimination policies. These agreements obligated Morgan Stanley to give or make available to Plaintiff leads, referrals, account distributions, training, sales support, managerial support, mentoring, and other resources. These agreements also obligated Morgan Stanley to comply with the civil rights laws and its equal employment and antidiscrimination policies.

121.    Morgan Stanley, through its management and other authorized representatives, made Plaintiff aware of the above-referenced written instruments, oral promises, employee handbooks, and patterns and practices of customary conduct.  It should have reasonably expected to induce action of a definite and substantial character on the part of Plaintiff.

122.    Plaintiff detrimentally relied on the above-referenced written instruments, oral promises, employee handbooks, and patterns and practices of customary conduct in accepting and continuing her employment with Morgan Stanley, among other things.

123.    By engaging in the conduct described above and otherwise failing to perform its obligations, Morgan Stanley breached its promises and agreements, causing substantial harm to Plaintiff.

## COUNT X

### BREACH OF IMPLIED CONTRACT AND UNJUST ENRICHMENT

**(Against Morgan Stanley, Bultman, Michalak, Girardin, and Flam)**

124.    Plaintiff realleges and incorporates by reference as though stated in Count X each preceding paragraph of this Complaint.

125.    By the conduct alleged above, Morgan Stanley breached certain implied contracts with Plaintiff and was unjustly enriched, at Plaintiff's expense, by its unlawful conduct.

126.    Plaintiff suffered losses and was otherwise harmed as a result of Morgan Stanley's unlawful conduct.

## COUNT XI

### FRAUD IN THE INDUCEMENT

**(Against Morgan Stanley, Chu, and Bultman)**

127.    Plaintiff realleges and incorporates by reference as though stated in Count XI each preceding paragraph of this Complaint.

128.    Michigan common law recognizes a cause of action for fraud in the inducement, where a party materially misrepresents future conduct under circumstances in which the assertions may reasonably be expected to be relied upon, and are relied upon.

129.    Morgan Stanley entered into certain oral and written contracts with Plaintiff.  In entering such contracts, Morgan Stanley made material representations, including that Plaintiff would receive fair compensation for her business plans and efforts.  By its actions described above, Morgan Stanley made such representations knowing that they were false, or made them recklessly without knowledge of the truth as a positive assertion, and intended that Plaintiff would rely on such assertions.

130.    Plaintiff did in fact rely on such assertions to her detriment.

131.    Plaintiff's reliance on such misrepresentations caused her substantial damage and harm.

## COUNT XII

**TORTIOUS INTERFERENCE WITH BUSINESS RELATIONSHIPS**

**(Against All Defendants)**

132.    Plaintiff realleges and incorporates by reference as though stated in Count XII each preceding paragraph of this Complaint.

133.    Plaintiff had business relations with certain third parties, of which Morgan Stanley had specific knowledge.

134.    Morgan Stanley and Defendants intentionally interfered with Plaintiff's business relations and acted with the purpose of harming Plaintiff by using dishonest, unfair and improper means.

135.    Morgan Stanley's interference induced or caused breaches and/or terminations of such business relationships and/or expectancies, causing substantial injury to Plaintiff.

## COUNT XIII

**INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS**

**(Against All Defendants)**

136.    Plaintiff realleges and incorporates by reference as though stated in Count XIII each preceding paragraph of this Complaint.

137.    Michigan common law recognizes a cause of action for intentional infliction of emotional distress when a defendant intentionally or recklessly causes severe emotional distress.

138.    The Defendants, as alleged in this Complaint, acted intentionally in an extreme and outrageous manner so as to cause Plaintiff severe emotional distress.

139.    Plaintiff suffered severe emotional distress.

140.    Plaintiff has suffered injuries and been otherwise harmed as a direct and proximate result of Defendants' unlawful conduct.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff respectfully requests that this Court find in her favor and against Defendant as follows:

a.  Declare that Defendant Morgan Stanley's acts, conduct, policies and practices toward Plaintiff and African-American clients and potential clients are unlawful;

b.  Declare that the conduct of the individual Defendants toward Plaintiff, and in some instances other African-Americans, is unlawful;

c.  Order appropriate equitable and injunctive relief to remedy Defendants' unlawful conduct;

d.  Award the present value of all compensation and benefits Plaintiff has lost and will lose in the future as a result of Defendant's unlawful conduct;

e.  Award all damages recoverable under law, including compensatory, exemplary, punitive and liquidated damages, as well as all damages recoverable under the Elliott-Larsen Civil Rights Act;

f.  Award prejudgment interest;

g.  Award reasonable attorneys' fees and costs;

h.  Award any and all other damages available under the law;

i.  Order appropriate equitable relief to remedy Defendant Morgan Stanley's discriminatory practices; and

j.  Award such other relief as this Court or a jury deems just and proper.

## DEMAND FOR A JURY TRIAL

Plaintiff hereby demands a jury trial as provided by Rule 38(a) of the Federal Rules of

Civil Procedure.

Respectfully submitted on behalf of Plaintiff,

/s/ Linda D. Friedman
_____
Linda D. Friedman

Linda D. Friedman
Suzanne E. Bish
**STOWELL & FRIEDMAN, LTD**.
321 S. Plymouth Court, Suite 1400
Chicago, Illinois  60604
(312) 431-0888
lfriedman@sfltd.com
sbish@sfltd.com

David M. Blanchard
**NACHT & ASSOCIATES, PC**
101 N. Main Street
Suite 555
Ann Arbor, MI  48104
(734) 663-7550
dblanchard@nachtlaw.com